Filed 7/18/24  P. v. Jaramillo CA2/2

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VINICIO MARCELO JARAMILLO,<br><br>    Defendant and Appellant. | B332970<br><br>(Los Angeles County<br>Super. Ct. No. BA357891) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Affirmed.

Mi Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Vinicio Marcelo Jaramillo (defendant), appeals from the order denying his petition for vacatur of his attempted murder conviction and for resentencing pursuant to Penal Code section 1172.6 (formerly section 1170.95),[1] entered after an evidentiary hearing held pursuant to subdivision (d) of that statute. Defendant contends substantial evidence does not support the trial court's finding he directly aided and abetted the attempted murder with intent to kill. We disagree and affirm the order.

## BACKGROUND

**2009 conviction**

In 2009, a jury convicted Jaramillo of the attempted murder of David Diaz (Diaz) and found the commission of the crime to be willful, deliberate, and premeditated. (§§ 664/187, subd. (a); count 1.) The jury found true the allegation that the crime was committed for the benefit of a gang and that a principal intentionally and personally discharged a firearm causing great bodily injury, within the meaning of section 12022.53, subdivisions (b) through (e)(1). Defendant was also convicted of carrying a loaded firearm not registered to him in a public place, under former section 12031, subdivision (a)(1) (count 2). Defendant was sentenced on count 1 to life in prison plus 25 years to life for firearm enhancements, and to a consecutive term of two years on count 2. The judgment was affirmed in *People v. Jaramillo* (May 31, 2011, B221863) [nonpub. opn.].

**Relevant 2009 trial evidence**

*Eyewitness testimony*

Jessi Hernandez and Manuel Sanchez both testified to the events they witnessed on June 8, 2009. Sanchez was driving and Hernandez

---

[1] All further unattributed code sections are to the Penal Code unless otherwise stated.

2

was in the back seat with her young daughter when a beige Toyota Camry cut them off as it came out of a motel parking lot, causing Sanchez to brake and utter an epithet. Hernandez and Sanchez both saw four Hispanic males with shaved heads whom Hernandez said looked like gang members. The driver turned and looked at Sanchez, while the two backseat passengers gave them dirty looks.

After the Camry made a turn, Sanchez did the same and was driving behind it when the Camry stopped and began backing up. Sanchez too had to back up. When the Camry stopped about two feet in front of Sanchez's car, the front passenger, Henry Lona, got out with a gun in his hand, that he pointed at the car parked at the curb trying to come out of the parking space but was blocked by Sanchez's car. Lona started shooting. Hernandez told Sanchez to get the license plate number as she held her daughter and hunkered down. Lona then got back in the Camry that drove off and made a right on Avalon Boulevard at a speed Hernandez described as "burning rubber." Sanchez described it as being at a normal speed. Hernandez then called 911. Diaz, the driver of the targeted car, looked injured to Sanchez. The car backed up, hit the parked vehicle behind it and drove off. The car also made a right turn on Avalon. Hernandez gave the 911 operator the license plate number.

When Hernandez later spoke to law enforcement, she identified Lona as the shooter from a photographic lineup. Sanchez also identified a photo of the Camry and a photograph of Lona.

### Gang expert testimony

Los Angeles Police Department (LAPD) Officer Jesse Drenckhahn, who was assigned to Newton Division Gang Enforcement Division, testified as the prosecution's expert on gang culture. He described his education, training, and expertise in that area, as well as his experience and contact with gang members.

Officer Drenckhahn explained that people become gang members in different ways. One way is to be "jumped in" meaning initiated into

the gang with a beating by members of the gang for certain period of time.  Or the prospective member could do what is called "putting in work" meaning to commit crimes on behalf of the gang, such as assaulting rival gang members or committing shootings, robberies, and other crimes.  On rare occasions a prospective gang member is "courted in" by other members due to the person's strong association with the gang, such as a long family lineage with the gang.

Respect is of ultimate importance to gangs and gang members.  Respect means that the gang will be feared by rivals and members of the community, which allows them to engage in criminal activities without being reported to the police.  Gangs create fear by wearing gang-related tattoos, vandalizing and spraying graffiti using the gang's name, committing violent crimes in public, displaying gang hand signs, approaching confronting people to identify their gang to them and ask about their gang associations.

Officer Drenckhahn explained that gangs have internal rules or codes of conduct.  Gang members commonly work as a team.  Their code requires them to back one another up, and if they do not they face discipline by other members.  A member should never have contact with or assist law enforcement, should back one another up in confrontations with rivals, and should actively participate in or advance the gang in committing crimes.  Discipline for rule breaking ranges from a beating to death.  Reporting to law enforcement will also bring discipline upon rival gang members.

Officer Drenckhahn testified that the shooting on June 8, 2009, was in the territory of the Playboys gang.  Officer Drenckhahn was acquainted with defendant, having come in contact with him in April 2009, and was of the opinion defendant, Lona and Diaz were all members of the Playboys gang.  This opinion was based upon his and other law enforcement officers' contact with them, as well as their many Playboy gang related tattoos, as depicted in photographs shown to the jury.  Given a set of hypothetical facts mirroring the shooting in

4

this case, Officer Drenckhahn's opinion was with multiple gang members acting against one member of their own gang, it was likely to be discipline for an offense against the gang or disrespect toward the gang.

### *Investigation*

Four spent bullet rounds were found in the street near the shooting, and two damaged SUVs were parked nearby, one with a bullet hole in the headlight and a round inside. On July 2, 2009, Detective Douglas Bell visited Diaz's home and observed Diaz had a wound to his left thumb, a bullet wound to his left chest, and a graze wound to his forehead. When Detective Bell asked Diaz about the events of June 8, he said, " 'I didn't see shit,' " and refused to look at suspect photographs. Detective Bell made a later attempt to serve a subpoena, but Diaz ran into the house, locked himself in, and eventually escaped though the back door.

Detective Kevin Raines testified that he was a LAPD gang investigator involved in the investigation of the shooting of Diaz on June 8, 2009. Detective Raines checked Department of Motor Vehicles registration records for the license number reported by a witness, and found the Camry was registered to defendant's mother.

On June 12, 2009, Officer Drenckhahn and his partner, Officer Sanchez were patrolling in a marked black-and-white police car, the general area of the shooting, within the territory of the Playboys gang. They were aware of the June 8 shooting and had been asked to keep an eye out for the Camry. Around 9:30 p.m., that night, they saw the Camry parked at a curb on East 49th Street with two men and two women standing near the trunk, drinking beer and eating pizza. Officer Drenckhahn recognized one of them to be defendant. One of the women was Lona's sister Desiree Lona. The officers detained the group for drinking and violating an injunction. Defendant asked Officer Drenckhahn what was wrong and said the car was his mother's. When Officer Drenckhahn started to pat him down, defendant said he had a

gun in his right front pants pocket. A loaded .380 caliber semiautomatic handgun was removed from defendant's pocket.[2] A later search of the Automated Fingerprint Identification System disclosed no firearms registered to defendant.

### *Defendant's police interview*

After defendant waived his *Miranda* rights,[3] Detective Raines interviewed him in several sessions. Recordings of the interviews were played for the jury, with Detective Raines explaining the meanings of certain terms in street slang, such as: "OG," an older gangster or older member of the gang; "strap" and "heat," a gun; "dumped on," being shot or shot at; and a "minute," a while or longer, even up to a month or two.

Detective Raines began the interview by asking defendant if he wanted to talk about what happened Monday at 51st Street and Avalon Boulevard involving his mother's car.[4] Defendant claimed his mother drove the car that day and said, " 'I don't even know, sir.' " When Detective Raines told defendant that one of his "homies" was shot on 51st Street and Avalon Boulevard, defendant asked, "One of my homies?" and "He got shot?" Detective Raines told defendant witnesses had come forward and described what happened. After lengthy, unsuccessful attempts to persuade defendant to tell him about the shooting, Detective Raines asked defendant his reason for being out there, and what he said about "him and the other homies." Defendant said the preceding day " 'he was … talking shit … with our other homies, you know, and I don't know what happened.' "

---

[2] The parties stipulated the gun was tested, compared to the bullets found at the scene of the shooing and found not to be the firearm that fired those bullets.

[3] See *Miranda v. Arizona* (1966) 384 U.S. 436, 444–445.

[4] We summarize only such portions of the interview (which takes approximately 80 pages of transcript) as may be relevant to our discussion.

Defendant later explained his group was going to the liquor store and he started "talking shit" to defendant's other homie, who got mad. Defendant's " 'other homie got out of the [Camry] and he started talking with this fool [who was on the phone in his parked car] and then that fool got shot, you know.' " Defendant claimed not to have heard what they were talking about, just the shots. His reaction was "What the fuck?" and "Who got shot?" He also claimed to not know why his homie did it and that he did not back the car up after it was stopped. Defendant admitted to knowing his homie carried a .38 handgun that defendant had seen in his pocket. When asked whether defendant saw the .38 handgun while driving on 51st Street, defendant said, " 'No, because I seen like – you know. When somebody stands up [inintelligible.]' " Lona showed it to him and defendant said, " '[W]hy are you bringing that shit?' " Defendant resisted naming the shooter but finally told Detective Raines that his homie was called " 'Little Lazy.' " Defendant claimed to not know his real name, so Detective Raines showed him a photo lineup from which defendant identified the shooter.

### Defendant's testimony

#### Relevant direct examination

Defendant testified at trial through an interpreter. He claimed to have asked for an interpreter for his interview, but Detective Raines refused, saying he spoke English well and did not need an interpreter. Defendant lived in this country about 13 years, having arrived when he was 11 or 12 years old. He attended school only one year in the seventh grade. Defendant testified he became a member of the Playboys gang when he was beaten into the gang at the age of 15, and had been a member for about 10 years. He chose Little Sleepy as his gang nickname. He had been arrested several times for " 'tagging' " but had never been in jail. He claimed not to have sold drugs, as the gang did not require it. He also claimed never to have attempted to or murdered anyone.

7

Defendant testified he did not know Diaz would be shot and would not have gone along if he had known. Earlier that day, defendant went to a hotel to visit another gang member and was surprised to see Lona there, along with about five others, just hanging out. After about 20 minutes Lona asked for a ride to the store and back to buy beer. The store was about five minutes away.

On the way to the liquor store they saw Diaz park his car and Lona told defendant to stop because he had to talk to Diaz. Defendant claimed he backed up the car, trying to get out of the way of the cars behind him. Lona got out, left the door half open, and defendant heard shots. Defendant had been trying to make a call and thought someone was shooting at them. Lona returned to the car seconds later. Defendant heard Diaz's car hit the car behind him, turned, and saw it was Diaz with a hole in the windshield. Lona put his gun between his legs and told defendant to step on it. Defendant claimed this was the first time he saw Lona with a gun. He drove three to five minutes back to the motel. During the drive, defendant and the other passengers asked Lona why he had done that. Lona told them not to say anything to anyone about what had just happened.

Defendant claimed no knowledge of Lona and Diaz having had problems in the past. He explained Diaz was an older gangster, and defendant used the term "talking shit'" with Detective Raines because Diaz had been in an argument with some of the lesser gang members two weeks before the shooting. Defendant admitted to have been there, but claimed not to have understood the argument. He knew Lona was a dangerous person and one of the back seat passengers was even more dangerous and " 'in no way' " did he have any idea when Lona told him to stop the car that Lona would try to kill Diaz.

### *Relevant cross-examination*

When the prosecutor asked why defendant in his interview with Detective Raines referred to Diaz as " 'the fool '" and Lona as " 'my homie,' " defendant blamed it on his poor understanding of English and

8

his nervousness in the interview.  Defendant said he did not know what he was saying.

Defendant did admit knowing the Playboys committed crimes such as selling drugs, fighting rival gangs, tagging walls and violent assaultive crimes, including murder, but denied ever being involved in a shooting or engaging in any violent crimes.  Defendant denied ever having seen any Playboy gang member committing crimes, other than tagging and selling drugs, before this one.  He said he knew about the violent crimes because he heard others talk about them, adding they did not talk to him about them.

Defendant admitted he purchased the gun found by Officer Drenckhahn on the street about one week earlier, from an unknown person he met through "Dopey," a Playboys member.  Defendant said he was going to register the gun, because he was afraid Lona would harm him and his family.  Defendant explained he was not afraid of Lona's sister as she was not a violent person.  He did find it strange she told him her brother was looking for him.  He was stopped as he was passing by, the group suggested they get pizza, which they did.  He was afraid but felt he was being pressured to stay.  He did not think it seemed strange until they told him to stay.

When asked about Diaz's argument with lesser gang members, defendant denied he understood what they were arguing about, explaining he did not hear and did not want to get involved as it was none of his business.  He claimed not to know who started it and Lona did not say anything about the dispute, as Lona did not know about it.  Defendant acknowledged telling Detective Raines that Diaz was "talking shit" with others the day before and that he also told Detective Raines Diaz was "punking the youngsters," but then testified the argument occurred two weeks before the shooting and claimed he did not remember which homie got mad or who Diaz was "punking."

Defendant testified that all but one of the people at the motel were gang members and he knew only their nicknames.  He found it

strange that Lona was there because defendant had never before seen him there.  When Lona asked defendant to take him to buy beer, "Temper," the violent one, and "Smurf" went with them.  Defendant then admitted he had seen and heard about Playboy members committing violent crimes.  He explained that before June 8 he had not seen the violent crimes, but now he was afraid of them because he knew they could kill.

Regarding the events surrounding the shooting, defendant testified when he stopped the car, Lona got out, leaving the car door half open.  Defendant then heard about five or six shots.  Defendant claimed he tried to cover himself because he thought someone was shooting at them.  Defendant explained he stopped the car because Lona said he wanted to see " 'what's up this fool,' " meaning he wanted to talk to him.  Defendant admitted having told Detective Raines that Lona got out of the car and started talking and explained he only thought he was going to talk to him, but he did not.  Defendant also explained when he told Detective Raines that his "homie got out of the car and went to shake his hand," he had thought that was what Lona was going to do.  Defendant claimed it was after the shooting when he saw Lona with a gun and asked, "Why are you bringing this shit?"

Defendant attributed conflicts between what he told Detective Raines and his testimony to not being able to use an interpreter during the police interview.  At the end of the interview Detective Raines offered to have defendant write his statement in Spanish, but defendant wrote it in English.  He explained he was nervous and "[i]t was what I could do at that moment."

Defendant admitted to having lied in the interview by relating facts about his mother's car and the shooting.  He also lied when he said, " 'I don't even know who capped this fool,' " and when he denied the others got back in the car.  Defendant explained he did not intend to say anything about the case because he felt intimidated and afraid and thought Lona's sister was in the building.

**Petition for resentencing**

In 2022, after defendant filed a petition for vacatur and resentencing pursuant to section 1172.6, the trial court issued an order to show cause and scheduled an evidentiary hearing that was held August 7, 2023. (See § 1172.6, subds. (c) & (d).) Prior to the hearing the parties agreed to the admission of the transcripts of defendant's 2009 trial testimony and police interview. The trial court reviewed all documents, heard the arguments of counsel, and denied the petition on August 7, 2023.

Defendant filed a timely notice of appeal from the order of denial.

## DISCUSSION

Defendant contends substantial evidence did not support the trial court's finding of the specific intent required to convict him of attempted murder.

### I. Senate Bill No. 1437

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437, which amended the laws pertaining to felony murder and murder under the natural and probable consequences doctrine, "to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) The statute bars murder liability under the natural and probable consequences doctrine (*People v. Gentile* (2020) 10 Cal.5th 830, 846) and this bar has been extended to attempted murder convictions. (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.) Section 1172.6 provides a procedure for those convicted of attempted murder under the natural and probable consequences doctrine to seek retroactive relief if they could not now be convicted under the amended laws. (§ 1172.6, subd. (a); see *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

11

Although an aider and abettor can no longer be convicted of attempted murder under the natural and probable consequences doctrine, the amended law does not bar the conviction of one who directly aids and abets attempted murder. (*People v. Coley*, *supra*, 77 Cal.App.5th at p. 548.) "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) To be guilty of attempted murder as a direct aider and abettor a person must share the perpetrator's intent to kill. (*Id*. at p. 624, citing *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) At the evidentiary hearing conducted pursuant to section 1172.6, subdivision (d), "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, . . . that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3); see *id*., subd. (c).)

## II. Standard of review

The jury here was instructed that a defendant could be convicted of attempted murder either pursuant to the natural and probable consequences doctrine or as a direct aider and abettor. The prosecutor argued both theories at trial. At the section 1172.6 evidentiary hearing, the prosecution was therefore required to prove beyond a reasonable doubt defendant was a direct aider and abettor who shared the perpetrator's intent to kill Diaz.

The trial court sits as an independent fact finder. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951) and must " 'review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard . . . .' " (*People v. Oliver* (2023) 90 Cal.App.5th 466, 480, quoting *People v. Clements* (2022) 75 Cal.App.5th 276, 298). On appeal from the denial of a petition after hearing, our task is to determine whether any rational trier of fact could have made the same determination beyond a reasonable doubt. (*People v. Vargas,* at p. 951.)

We apply the substantial evidence standard of review. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 233–234.) Under the usual substantial evidence standard, "we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The standard is deferential, but the evidence in support of the judgment must be *reasonable, credible, and of solid value*; 'a mere possibility' or '[s]peculation is not substantial evidence' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 120.) We defer to the trial court's resolution of conflicts and credibility determinations. (*People v. Clements, supra*, 75 Cal.App.5th at p. 298.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Reversal on a substantial evidence ground "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conclusion of the trier of fact].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"[W]hen a criminal defendant claims on appeal that his conviction was based on insufficient evidence of one or more of the elements of the crime of which he was convicted, we *must* begin with the presumption that the evidence of those elements *was* sufficient, and the defendant bears the burden of convincing us otherwise." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) "[T]he defendant must present his case to us consistently with the substantial evidence standard of review. . . . If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the [ruling] may lie in the evidence he ignores." (*Id.* at p. 1574.)

13

Defendant has failed to carry his burden here. He recites the rule that the evidence must be summarized in the light most favorable to the ruling, but he has argued the opposite, omitting most of his interview with Detective Raines as well as his cross-examination testimony, and ignoring his own admissions. Nevertheless, we have reviewed the trial transcripts and summarized the relevant evidence in the light most favorable to the ruling, and we discuss defendant's contentions.[5]

## III. Premeditation and deliberation

Defendant contends the prosecution was required to prove not only that he harbored an intent to kill when he aided and abetted the attempted murder, but also that he personally premeditated and deliberated the attempted murder. We disagree. Although the trial court found defendant personally premeditated and deliberated his intent to kill, the court was not required to do so. " '[W]illful, deliberate, and premeditated' does not establish a greater degree of attempted murder but, rather, sets forth a penalty provision prescribing an increased sentence (a greater base term) to be imposed upon a defendant's conviction of attempted murder when the additional specified circumstances are found true by the trier of fact." (*People v. Bright* (1996) 12 Cal.4th 652, 669, disapproved on another ground in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.) If such a special allegation is found true due to the mental state of the perpetrator, additional punishment may be imposed upon an aider and abettor who

---

[5] Defendant complains in his reply brief that the People rely on the factual summary in the appellate opinion in *People v. Jaramillo, supra*, B221863, contrary to what is permitted by section 1172.6, subdivision (d)(3). The People also incorporated by reference the factual summary in the prosecution's reply to the petition below. We have not considered the facts contained in the People's brief on appeal, but instead rely on our own independent review.

14

acted with an intent to kill, but who did not personally deliberate and premeditate. (*People v. Lee*, *supra*, 31 Cal.4th at pp. 624–625.) There is thus no separate offense of premeditated and deliberated attempted murder. Only where the prosecution fails to sustain its burden of proof as to the underlying prior offense, here attempted murder, that special allegations and enhancements attached to the conviction are vacated. (See § 1172.6, subd. (d)(3).)

As defendant concedes, Lona's shooting Diaz several times at close range showed Lona intended to kill (see *People v. Smith* (2005) 37 Cal.4th 733, 742) and defendant does not dispute it supported an inference that Lona's intent was premeditated and deliberated, citing *People v. Marks* (2003) 31 Cal.4th 197, 230 ("a close-range shooting without any provocation . . . or evidence of struggle . . . demonstrates premeditation and deliberation"). The attempted murder committed by Lona was therefore a premeditated and deliberated crime, regardless of whether defendant personally premeditated and deliberated. (See *People v. Lee*, *supra*, 31 Cal.4th at pp. 624–625.) As such, we need not address defendant's lengthy analysis of selected evidence under the factors which may support a finding of premeditation and deliberation, as discussed in *People v. Anderson* (1968) 70 Cal.2d 15.

We thus turn to defendant's claim that his attempted murder conviction must be vacated because no substantial evidence supported a finding he shared Lona's intent when he facilitated Lona's attempt to kill Diaz.

## IV. Intent to kill

The trial court found defendant remained guilty of attempted murder as a direct aider and abettor.

A direct aider and abettor of attempted murder is one who encourages or assists the direct perpetrator sharing his intent to kill and intending to facilitate the killing. (*People v. Lee*, *supra*, 31 Cal.4th at p. 624.) " '[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder,

15

may . . . be inferred from the defendant's acts and the circumstances of the crime.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

At the hearing on the petition defendant objected to the consideration of any gang expert opinion. On appeal, defendant argues the gang expert's opinion does not supply substantial evidence of intent to kill because gang membership *alone* is insufficient proof of intent or aiding and abetting. (See e.g. *People v. Guillen* (2014) 227 Cal.App.4th 934, 992, and cases cited therein.)

A gang expert may not give an opinion on the defendant's state of mind or whether he committed the crime (*People v. Vang* (2011) 52 Cal.4th 1038, 1047–1048), but "[t]he People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense. [Citation.] 'Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Expert opinion is ordinarily admissible for such purposes if "guided by hypothetical questions … ' "rooted in facts shown by the evidence." ' " (*People v. Renteria* (2022) 13 Cal.5th 951, 967.)

Gang evidence can thus provide evidence of motive and of intent to kill. (See *People v. Chhoun*, *supra*, 11 Cal.5th at pp. 31–33.) And "evidence of motive is often probative of intent to kill." (*People v. Smith, supra,* 37 Cal.4th at p. 741.) Moreover, despite defendant's suggestion to the contrary, proof of intent and aiding and abetting was not solely dependent upon defendant's gang membership, and the expert did not give his opinion as to whether defendant facilitated the crime or intended to kill.

Officer Drenckhahn testified that respect is of ultimate importance to gang members, and that gangs have internal codes of

16

conduct. Discipline for a member who fails to comply may range from a beating to death. Officer Drenckhahn expressed his opinion based upon hypothetical facts that an assault by multiple gang members against one member of their own gang is likely to be meant as discipline motivated by an offense against the gang or disrespect toward the gang.

Defendant, Lona, the two backseat passengers during the shooting, and Diaz were all members of the Playboys gang. Sometime before the shooting Diaz, an older Playboys member, and some younger members engaged in an argument during which Diaz was "punking the youngsters."[6] Defendant told Detective Raines the argument occurred the day before the shooting but testified that it had been two weeks before the shooting. Defendant said Diaz was " 'talking shit with our other homies,' " and defendant denied knowing or understanding what the argument was about, though he was present during the argument. The trial court was not required to believe defendant and was entitled to reject all or part of the testimony (see *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463). The trial court did not believe him. The court found defendant was " 'aware of the underlying circumstances involving the beef' " and Diaz, providing evidence of motive to seek revenge for Diaz's disrespect.[7] The trial court was justified in making

---

[6]  Defendant was approximately 26 years old at the time of trial.

[7]  Defendant contends the argument between Diaz and the younger gang members cannot suggest a motive because it was trivial and he and Diaz shook hands afterward. Defendant also notes his statement to Detective Raines that Lona "shoot for no reason another homeboy from the same hood." It is not for an appellate court to overrule a trial court's credibility determination. (*People v. Hamlin, supra,* 170 Cal.App.4th at p. 1463.) Furthermore, "the judgment is not subject to reversal on appeal simply because the prosecution relied heavily on circumstantial evidence and because conflicting inferences on matters bearing on guilt could be drawn at trial." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)

its credibility determinations against defendant, as defendant gave many clearly conflicting and evasive answers to both Detective Raines in his interview and in his trial testimony. He also admitted he lied in some parts. "[A] witness knowingly false in one part of his testimony is to be distrusted in the whole." (*People v. Cook* (1978) 22 Cal.3d 67, 86.)

"Evidence of motive aside, it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*People v. Smith, supra*, 37 Cal.4th at p. 741.)

On June 8, 2009, either one day or two weeks after Diaz had disrespected younger members of his gang, defendant joined a gathering of Playboys gang members in a motel room and was there just 20 minutes before leaving with Lona and "Temper," both of whom defendant knew to be particularly violent members of his violent gang, and one other person, "Smurf." As the trial court found, defendant knew that Lona was armed with a firearm. Defendant admitted he knew Lona carried a handgun and that he had seen the gun in Lona's pocket while Lona was standing, before they got into the car. When Lona showed the gun to him defendant claimed he said, " '[W]hy are you bringing that shit?' " Defendant did not state the response, but he nevertheless drove Lona and the other gang members to Diaz's location. When they located Diaz in his parked car, defendant backed up close to Diaz's car. Although defendant claimed he backed up intending to allow cars behind him to pass, he in fact blocked the car behind him, preventing the two witnesses from passing the Camry without backing up, which in turn prevented Diaz from moving his car until the shooting was over and the Camry left the scene. In sum, defendant met with a group of fellow gang members after Diaz had disrespected them or other fellow gang members, and then knowing

18

that Lona was armed, defendant drove him and two others until Diaz was spotted. Defendant then stopped and backed up the car, preventing Diaz's escape, waiting until Lona with his gun, got out of the car and back in again. Defendant then drove Lona away from the scene.

Defendant suggests because neither Lona, Diaz, nor the two other gang members offered statements or gave testimony to contradict his own, the only evidence of his state of mind is his version of the events. Again, the trial court did not have to believe him. "Direct evidence of the mental state of the accused is rarely available except through his or her testimony. The trier of fact is and must be free to disbelieve the testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused. Thus, an act which has the effect of giving aid and encouragement, and which is done with knowledge of the criminal purpose of the person aided, may indicate that the actor intended to assist in fulfillment of the known criminal purpose." (*People v. Beeman* (1984) 35 Cal.3d 547, 558–559.)

As the trial court found here, defendant was " 'not simply driving by a location where Mr. Diaz is located. [Defendant] engages in very specific conduct with his vehicle . . . : pulling up, cutting off, and, in fact, engaging in conduct so forceful and aggressive that there's an entirely innocent car full of people which has to take evasive action to avoid being hit because of [defendant's] decision to stop and then back into the area of the other vehicle, and that demonstrates a very deliberate course of conduct on the part of [defendant], not just to scare and intimidate, but actually set the scene to provide [Lona] with the opportunity to do something further.' "

The most reasonable inference is that "something further" was Lona's intent to shoot Diaz at close range, and defendant concedes that the evidence established that Lona intended to kill Diaz. Defendant's conduct showed he knew Lona's purpose when, knowing Lona was

19

armed, he drove him and their two fellow gang members close to Diaz and facilitated Lona's purpose by trapping him.

We conclude that substantial evidence supported the trial court's finding that defendant was a direct aider and abettor who shared the actual killer's intent to kill, such that any rational trier of fact could have made the same determination beyond a reasonable doubt. (*People v. Vargas, supra*, at p. 951.) One who directly aids and abets attempted murder may still be convicted after the amendments to sections 188 and 189. (*People v. Coley*, *supra*, 77 Cal.App.5th at p. 548.) Thus defendant is ineligible for relief under section 1172.6.

## DISPOSITION

The order of August 7, 2023 denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED.

_____
CHAVEZ, J.

We concur:

_____
ASHMANN-GERST, Acting P. J.

_____
HOFFSTADT, J.

20